17744

Henry L. ROSCOE, as Administrator of the Estate of James B. Huntley, Respondent, v. H. M. GRUBB and Harold Lee Grubb, Appellants

(118 S. E. (2d) 337)

*Messers. Paul M. Arant,* of Pageland, and *Nelson, Mullins & Grier,* of Columbia, *for Appellants,*

*Messrs. F. Turner Clayton* and *Charles O. Nock,* of Cheraw, *for Respondent,*

February 8, 1961.

LEGGE, Justice.

In this action for wrongful death the defendants' motions for nonsuit and direction of verdict were refused, and the jury found for the plaintiff $17,500.00 actual damages. Thereafter, the trial Judge refused defendants' motion for judgment *n. o. v.*, but ordered a new trial because of excessiveness of the verdict unless the plaintiff should remit $3,500.00 of it, which was done. From the judgment accordingly entered in the amount of $14,000.00 the defendants appeal; and the single issue before us is whether there was any evidence reasonably warranting the inference that the death of plaintiff's intestate on August 3, 1957, was proximately caused by injury received in an automobile collision on August 9, 1956.

The collision was between an automobile of the decedent, Mr. Huntley, which he was driving, and an automobile registered in the name of the defendant H. M. Grubb and driven by his minor son and codefendant Harold Lee Grubb. Mrs. Huntley was in the car with her husband; and immediately after the accident they went to the office, or clinic, of Dr. Jerry Perry, who for some years had been

their family physician. As a witness for the plaintiff, Dr. Perry testified, in substance, as follows:

Mr. Huntley, who was sixty-three years of age at the time of the accident, was first treated by Dr. Perry in August, 1953, and thereafter several times during September, and in November, of that year. When he first came to Dr. Perry's office, on August 18, 1953, he was suffering from bronchitis, but also gave a history of having diabetes. On that occasion his blood pressure was a little high, and there was some albumen, but no sugar, in his urine. Dr. Perry treated him for bronchitis, and last saw him that year on November 7. In 1954 he was seen by Dr. Perry only twice; in 1955 at least twenty times, primarily in relation to his diabetes. In March, 1956, Dr. Perry saw him twice, and, suspecting a mild congestive heart failure, prescribed digitalis; arteriosclerosis and diabetes were also evident.

Thereafter Dr. Perry did not see Mr. Huntley until August 9, 1956, shortly after the accident. His only complaint was that he had a bruise of his chest and of his left knee; and he appeared concerned about the condition of his wife. (We infer that she had sustained some injuries, but their extent is not mentioned in the record here.) Dr. Perry testified that his examination of Mr. Huntley revealed that his bruises were trivial, requiring no medication; and that after examining Mrs. Huntley also he reassured them and told them to go home.

Mr. Huntley came to Dr. Perry's office on the following day, August 10, for a general examination; and since he still complained of pain in his chest Dr. Perry took an x-ray, which revealed nothing abnormal. On August 13, when Dr. Perry next saw him, he manifested symptoms of congestive heart failure, for which Dr. Perry prescribed digitalis and Diamox, the latter a diuretic. Dr. Perry again saw him on August 15, 16, 23 and 27, September 3 and 29, and October 1. There is no suggestion that treatment during this period was for any physical injury sustained in the accident. Ac-

cording to Dr. Perry, Mr. Huntley's symptoms, other than those of general deterioration as the result of diabetes and arteriosclerosis, were primarily those of emotional instability and worry.

On October 1 he was free of unfavorable physical symptoms and, in Dr. Perry's opinion, was in reasonably good physical condition for a man of his age. On November 2, 1956, he was brought to Dr. Perry's office showing symptoms of a coronary heart attack; and after treating him there and later visiting him several times at his home, Dr. Perry had him hospitalized on November 12. At that time he was feverish, somewhat dehydrated, and mentally confused. On November 23, Mr. Huntley having returned from the hospital, Dr. Perry visited him at his home and thereafter continued to see and treat him until his death, which occurred on or about August 3, 1957. During this period Mr. Huntley's deterioration, mental and physical, was rapid; he made groundless accusations against his wife; he would get lost in his own home; he would at times wander into the highway; he had to be constantly attended.

In our opinion Dr. Perry's testimony furnishes no reasonable basis for inference that Mr. Huntley's death was proximately caused or hastened by the trivial physical injury that he had sustained in the automobile accident a year before. And this conclusion on our part is not shaken by the following, which we quote from the concluding portion of his examination in chief:

"Q. All right, now Doctor, this collision that he was involved in, did he ever recite to you what occurred at that time? Did this worry him or bother him in any way that you saw? A. He was quite concerned about his wife and then later on after he saw that she was going to be all right he was quite concerned because—he expressed to me the fact he was quite concerned because he couldn't get anything settled about it. In other words, it was in a state of instability at that time.

"Q. Doctor, in your opinion did this collision have any effect on the speed of this arteriosclerosis condition that you described that Mr. Huntley had? A. Judging from the fact that I had treated him prior and the fact that he was doing reasonably well and then he had his accident in August and the beginning of his deterioration rather markedly in November of the same year, it would be my opinion that it accelerated the process.

"Q. As a result did it accelerate the time of his death? A. Yes, sir."

It is significant that in his testimony just quoted Dr. Perry refers not to Mr. Huntley's injuries, but to "his accident", as accelerating the process of arteriosclerosis and consequent deterioration and ultimate death. In context with the rest of his testimony, it can mean only that in the opinion of the witness Mr. Huntley's arteriosclerosis was accelerated as the result of his concern over his wife's condition and worry over his own inability to obtain prompt settlement of his claims arising out of the accident.

Respondent relies upon *Padgett v. Colonial Wholesale Distributing Co.*, 232 S. C. 593, 103 S. E. (2d) 265, for support of his contention that under this testimony it was for the jury to say whether or not Mr. Huntley's death was proximately caused by the defendants' negligent act. But that case does not support such contention. There, recognizing the rule in *Mack v. South Bound R. Co.*, 52 S. C. 323, 29 S. E. 905, 40 L. R. A. 679, 68 Am. St. Rep. 913, we upheld recovery for physical injury sustained as a consequence of shock, fright, and emotional upset directly caused by the defendant's negligent act, though there was no physical impact. Here, the claimed emotional upset and consequent acceleration of physical deterioration resulted not from the defendants' negligent act, but from Mr. Huntley's concern, at first, over his wife's condition, and from his fretting over the delay in settlement of his claims. Distinction between the *Padgett case* and the one at bar is obvious. In the former, the plaintiff's fright was a natural, immediate, and fore-

seeable result of the negligent operation of the defendant's truck whereby it crashed into the plaintiff's home; the ensuing physical consequences were no less the direct result of the negligent act than were the shock and fright that attended it. In the instant case Mr. Huntley's injury was nothing more than a trivial bruise; of itself it entailed, so far as the record indicates, no shock, fright or emotional upset. His concern over his wife's possible injuries was apparently short-lived, and according to Dr. Perry it ended when "he saw that she was going to be all right." The worry that respondent would couple to appellants' negligent act so as to make that act the proximate cause of the death of his intestate concerned not the negligent act itself but the decedent's impatience or dissatisfaction with the progress of negotiations or litigation looking to settlement of his claims, which included a claim for damage to his automobile. To uphold his contention would be to extend the concept of proximate cause far beyond the scope contemplated in the *Padgett case* or any other precedent in this jurisdiction, and, we think, beyond reason.

Respondent's case is not aided by the testimony of his lay witnesses. Those who actually testified were Mr. Huntley's widow, his pastor, and a married daughter who lived nearby; in addition, there were three members of the decedent's family, and two neighbors, who did not testify in person, but as to whom it was stipulated that they were available as witnesses for the plaintiff and that if they were to take the stand their testimony would be substantially the same as the three lay witnesses who had testified. Mrs. Huntley's testimony was to the effect that although her husband was a diabetic he was healthy and robust prior to the accident; that after the accident he did no more work around his farm; that before he went to the hospital in November, 1956, he was nervous, lost appetite and weight, and talked "a good bit", "mostly about the wreck"; that he just "kept going down and down until he just become skin and bones"; and that for some time before his death he "completely lost his mind" and "had to be cared for just like a baby."

The Reverend Mr. Oldham testified that after the accident Mr. Huntley, who before had attended church about once every two weeks, came to church only once; that when the witness and Mrs. Oldham called upon Mr. and Mrs. Huntley a day or so after the accident Mr. Huntley seemed to be "sore and suffering some from the wreck" and both he and Mrs. Huntley appeared "highly emotional and disturbed about it"; that thereafter the witness called upon Mr. Huntley about once a week "and then he began to grow worse," lost weight, and seemed "just wearing away."

Mr. Huntley's married daughter, Mrs. Chapman, testified that before the accident her father was in sound health and had had no serious illness. And: "after the collision Dad became very nervous and when we would talk to him, get in conversation, he would immediately wander off into about the wreck. That was the main thing that seemed to be on his mind was about the wreck * * *. He finally, I would say after November, he lost his mind completely to the point where we could not leave him alone at all."

We have held that where physical injury is coincident ██ with or immediately follows an accident and is naturally and directly connected with it lay testimony may be sufficient to carry to the triers of the facts the issue of whether or not the accident proximately caused it, despite expert medical testimony that it did not. *Poston v. Southeastern Construction Co.*, 208 S. C. 35, 36 S. E. (2d) 858; *Ballenger v. Southern Worsted Corp.*, 209 S. C. 463, 40 S. E. (2d) 681. In such cases consideration is to be given to the fact that the physical injury immediately, or promptly, followed the accident; but that is not to say that a finding of causation may rest solely upon the illogic of *post hoc, ergo propter hoc*. There must, in addition, be such natural and obvious relationship between the facts of the accident and the subsequent injury as to render consonant to common sense and reason the inference that the injury not only followed the accident but also resulted from it. The testimony of the lay witnesses here fails to meet that test. In our opin-

ion it affords no reasonable basis for inference that the facts of the accident, including the trivial physical injury resulting, caused Mr. Huntley's worry, aggravated his diabetic or arteriosclerotic condition, or otherwise proximately caused or hastened his death.

Reversed and remanded for entry of judgment in favor of appellants under Rule 27.

STUKES, C. J., and TAYLOR, OXNER and MOSS, JJ., concur.